**Silence Law Group, PLLC**
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024

**Jeffrey Silence** (029143)
Direct Dial: (602) 932-8358
Email: jeff@silencelaw.com

**Trevor Cook** (037952)
Direct Dial: (602) 932-5868
Email: trevor@silencelaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marilyn Grosso,<br><br>        Plaintiff,<br><br>    v.<br><br>Intermountain Centers for Human Development, Inc., an Arizona corporation, d/b/a Intermountain Health Center, Inc.,<br><br>        Defendant. | Case No.<br><br>**COMPLAINT (JURY TRIAL DEMANDED)** |

### I.    INTRODUCTION

1. This is an action for federal disability discrimination, interference with federally protected medical leave, unlawful retaliation for exercising federal rights, retaliation under the federal False Claims Act, and whistleblower retaliation under Arizona law.

2. Plaintiff Marilyn Grosso was a Team Lead and Community Counselor at Defendant Intermountain Centers for Human Development, Inc.'s Tucson site.

3. In August 2024, Plaintiff refused to bill the Arizona Health Care Cost Containment System ("AHCCCS") for certain pediatric services because she believed they were unnecessary, not clinically justified, improperly documented, and—in some cases—not rendered.

4. The patients receiving or purported to be receiving the services were minor children aged 5 through 17.

5. Plaintiff reported her observations of fraudulent billing to the Medicaid Arizona Office of the Inspector General.

6. Within weeks of Plaintiff's report, Defendant disciplined her for alleged "gossip" for reporting the fraudulent billing to her supervisors and "insubordination" for refusing to engage or asking her subordinates to engage in the fraudulent billing.

7. As part of that discipline, Defendant imposed unique workplace rules and restrictions on Plaintiff that it did not impose on the other Team Lead at the Tucson site.

8. As part of that discipline, Defendant assigned Plaintiff to a parking space specially monitored by the executive director who would track when she was there and not.

9. No similarly-situated colleagues had their parking monitored like this.

10. Until her August 2024 reports, Plaintiff had received consistently positive performance reviews.

11. Before her August 2024 reports, Defendant's Vice President handpicked Plaintiff to assist in training at a newly acquired facility.

12. Plaintiff suffers from Stage 4 non-alcoholic steatohepatitis ("NASH") liver disease, a progressive condition that eventually requires a transplant.

13. On October 11, 2024, Plaintiff was hospitalized for complications from her liver disease.

14. On October 18, 2024, Plaintiff had surgery related to her liver disease.

15. Defendant interfered with Plaintiff's physician-certified FMLA leave by denying it twice on improper grounds.

16. Defendant severed Plaintiff's access to her work electronic accounts while she was on protected medical leave in anticipation of its planned termination of Plaintiff's employment.

17. Defendant reassigned Plaintiff's caseload to other staff while she remained on protected medical leave in anticipation of its planned termination of Plaintiff's employment.

SILENCE LAW GROUP

2

SILENCE LAW GROUP

18.     Defendant shortened deadlines and denied receiving required paperwork from Plaintiff while she was on ADA leave to create a pretext to deny Plaintiff medical leave or terminate her employment.

19.     Before May 15, 2025, Plaintiff submitted certain ADA documentation twice within six days.

20.     On May 15, 2025, at 6:22 a.m., Defendant's Chief Human Resources Officer emailed Plaintiff demanding that she submit the same ADA documentation that same day before 5:00 p.m.

21.     At 5:24 p.m. that same day, Defendant terminated Plaintiff for "job abandonment."

22.     Plaintiff did not abandon her job.

23.     Plaintiff was in active two-way communication with Defendant's Chief Human Resources Officer for the approximately eight months leading up to her termination.

24.     Plaintiff brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112 and 12203.

25.     Plaintiff brings claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.

26.     Plaintiff brings claims under the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h)

27.     Plaintiff brings claims under the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501(3)(c).

**II.     JURISDICTION AND VENUE**

28.     This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331.

29.     This Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367(a) because that claim is part of the same case or controversy as her federal claims.

3

SILENCE LAW GROUP

30. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Pima County, Arizona.

31. Plaintiff was employed in Pima County, Arizona.

32. Plaintiff was terminated in Pima County, Arizona.

33. This case is properly assigned to the Tucson Division of this Court because the events giving rise to the claims occurred in Pima County.

**III.   ADMINISTRATIVE EXHAUSTION**

34. In April 2025, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 540-2025-04032.

35. Plaintiff's April 2025 EEOC Charge alleged retaliation, discrimination, and harassment.

36. In May 2025, Plaintiff amended her EEOC Charge to include disability discrimination and disability-based retaliation under the ADA.

37. On February 11, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.

38. The EEOC transmitted the Notice of Right to Sue via the EEOC public portal.

39. This Complaint is filed within ninety days of the EEOC's issuance of the Notice of Right to Sue.

40. Plaintiff has satisfied all conditions precedent to suit under the ADA.

41. The FMLA does not require a plaintiff to exhaust administrative remedies.

42. The FCA does not require a plaintiff to exhaust administrative remedies.

43. The AEPA and False Claims Act do not require a plaintiff to exhaust administrative remedies.

**IV.   PARTIES**

44. Plaintiff Marilyn Grosso is a 45-year-old resident of Pima County, Arizona.

45. At all material times, Plaintiff was an employee of Defendant within the meaning of the ADA, 42 U.S.C. § 12111(4).

4

SILENCE LAW GROUP

46.   At all material times, Plaintiff was an employee of Defendant within the meaning of the FMLA, 29 U.S.C. § 2611(3).

47.   At all material times, Plaintiff was an employee of Defendant within the meaning of the AEPA, A.R.S. § 23-1501.

48.   Defendant Intermountain Centers for Human Development, Inc. is an Arizona corporation.

49.   Defendant does business as Intermountain Health Center, Inc.

50.   Defendant operates more than fifty behavioral-health and counseling sites throughout Arizona.

51.   Defendant employs several thousand individuals statewide.

52.   At all material times, Defendant was an employer within the meaning of the ADA, 42 U.S.C. § 12111(5).

53.   At all material times, Defendant was an employer within the meaning of the FMLA, 29 U.S.C. § 2611(4).

54.   At all material times, Defendant was an employer within the meaning of the AEPA, A.R.S. § 23-1501.

55.   At all material times, Defendant was an employer within the False Claims Act retaliation provision.

## V.   FACTUAL ALLEGATIONS

### A.   Plaintiff's employment, qualifications, and exemplary record.

56.   Defendant hired Plaintiff on February 28, 2022.

57.   Plaintiff worked at Defendant's Tucson site.

58.   Plaintiff held the dual job titles of Team Lead and Community Counselor.

59.   As Team Lead, Plaintiff was responsible for clinical and administrative oversight of an assigned team of clinical staff.

60.   As Team Lead, Plaintiff monitored service delivery within contractual timelines.

SILENCE LAW GROUP

61. As Team Lead, Plaintiff conducted monthly patient chart audits to ensure proper documentation.

62. As Team Lead, Plaintiff ensured patient charts complied with company and licensing standards.

63. As Community Counselor, Plaintiff provided direct clinical services to patients.

64. As Community Counselor, Plaintiff documented case activities for both clinical and billing purposes "in accordance with agency and AHCCCS standards."

65. From her hire date through August 2024, Plaintiff received consistently positive performance reviews from her Program Director, Christina Griffin.

66. Before August 2024, Plaintiff received "excellent" ratings on her performance reviews.

67. Before August 2024, Plaintiff received written commendations of her leadership.

68. Defendant's Vice President and Christina Griffin, Plaintiff's Program Director, selected Plaintiff as the only Team Lead at her site chosen to assist in training for a newly acquired facility.

69. Plaintiff received no significant disciplinary action of any kind before making her whistleblowing complaints in August 2024.

**B.      Plaintiff's disability.**

70. Plaintiff has been diagnosed with Stage 4 non-alcoholic steatohepatitis (NASH) liver disease.

71. NASH is a genetic, progressive condition.

72. NASH has no cure.

73. NASH requires ongoing medical management.

74. Plaintiff's NASH will ultimately require a liver transplant.

75. Plaintiff's liver disease substantially limits one or more major life activities and major bodily functions within the meaning of 42 U.S.C. § 12102(1)–(2).

6

SILENCE LAW GROUP

76.     Plaintiff's liver disease substantially limits the operation of her digestive, immune, hemic, and circulatory systems.

77.     Plaintiff's liver disease substantially limits her ability to fight ordinary bacterial infection.

78.     Even routine illness can trigger life-threatening complications for Plaintiff.

79.     Plaintiff is a person with a disability under the ADA.

**C.     Plaintiff's protected activity: refusal to participate in and internal and external reporting of fraudulent AHCCCS billing.**

80.     Lisa Lenius was promoted to be Defendant's Regional Executive Director shortly before July 2024.

81.     In or about July 2024, Plaintiff observed that Lenius was directing case managers, counselors, team leads, and program directors to administer lengthy billable diagnostic assessments to minor clients ages 5 through 17.

82.     Lenius directed staff to bill AHCCCS for the diagnostic assessments and the related services.

83.     Lenius directed billing for these assessments even when the assessments were not clinically justified by the client's presenting condition or treatment record.

84.     Plaintiff believed that the assessments were being conducted primarily so they could be billed to AHCCS instead of meeting patient need.

85.     Plaintiff also observed that some services for which Defendant was billing AHCCCS were not actually rendered.

86.     Plaintiff also observed that other services were not properly documented to support the AHCCCS claims Defendant was making.

87.     Plaintiff observed Lenius state in a leadership meeting that Lenius's newly implemented assessment protocol had produced significant additional revenue for Defendant during the months leading up to Plaintiff's protected reporting activity.

88.     Plaintiff observed Lenius discussing the possible implementation of the protocol at additional sites.

SILENCE LAW GROUP

89.    The conduct Plaintiff observed, if true, would violate 31 U.S.C. § 3729(a)(1)(A), (B), (C) (false claims under the FCA).

90.    The conduct Plaintiff observed, if true, would violate A.R.S. § 36-2918 (false claims to AHCCCS).

91.    The conduct Plaintiff observed, if true, would violate A.R.S. § 36-2918.01 (failure to report suspected fraud or abuse in AHCCCS claims).

92.    The conduct Plaintiff observed, if true, would violate A.R.S. § 13-2310 (fraudulent schemes and artifices).

93.    The conduct Plaintiff observed, if true, would violate A.R.S. § 13-2311 (falsification or omission of material fact pursuant to a scheme or artifice to defraud or deceive a state department or agency).

94.    Around the beginning of August 2024, Plaintiff met in person separately with her clinical supervisors Paula Garcia and Amber Ness.

95.    In those meetings, Plaintiff told Ness and Garcia that she would not personally bill in the manner being directed because doing so would jeopardize her professional license and violate her ethical obligations.

96.    Plaintiff also told Ness and Garcia that, as a Team Lead, she would not instruct the counselors and case managers under her supervision to bill in that manner.

97.    After those meetings, in or about the second week of August 2024, Plaintiff called the Arizona Office of Inspector General and reported that Defendant was billing AHCCCS for unnecessary services and services not actually provided.

98.    Plaintiff also reported that Defendant's Regional Executive Director was directing staff to bill AHCCCS for services Plaintiff believed to be unnecessary, not clinically justified, improperly documented, or—in some cases—not rendered.

99.    Plaintiff also reported that minor patients ages 5 through 17 were being subjected to lengthy assessments Plaintiff believed to be conducted primarily so they could be billed to AHCCS rather than for meeting the patients' needs.

100. After Plaintiff's report to the Arizona Office of Inspector General, officials from the state came to inspect Defendant's records.

101. A week after the inspection of records, Lenius told Plaintiff and the other employees under her that they would no longer be universally taking the patient assessments Lenius had previously promoted.

102. Plaintiff's August 2024 in-person refusals to bill in the directed manner or direct her subordinates to bill in that manner is protected activity under 31 U.S.C. § 3730(h)(1) and A.R.S. § 23-1501(A)(3)(c)(i).

103. Plaintiff's August 2024 report to the Arizona Office of Inspector General is protected activity under 31 U.S.C. § 3730(h)(1) and A.R.S. § 23-1501(A)(3)(c)(ii).

**D.     Retaliation begins in September 2024.**

104. Within weeks of Plaintiff's reports, Defendant retaliated against her.

105. Defendant knew Plaintiff reported to state authorities about Defendant's billing practices because the state investigated Defendant shortly after Plaintiff objected to Defendant's billing practices and refused to follow or direct the employees under her to follow them to her clinical supervisors Paula Garcia and Amber Ness.

106. After Plaintiff's reports, Regional Executive Director Lisa Lenius — the very person Plaintiff had reported — disciplined Plaintiff for alleged "gossip" and "insubordination."

107. Lenius characterized Plaintiff's protected objections and refusal to perpetuate the fraudulent billing practices and protocols as misconduct.

108. Lenius issued Plaintiff a series of new workplace rules, restrictions, and expectations.

109. None of those rules, restrictions, or expectations applied to the other Team Lead at the Tucson site.

110. The other Team Lead held the same role, the same title, and the same responsibilities as Plaintiff.

SILENCE LAW GROUP

111.    After Plaintiff's reports, Defendant heightened monitoring of Plaintiff's vehicle location in the assigned parking area.

112.    Defendant did not apply heightened vehicle location monitoring to similarly situated colleagues.

113.    After Plaintiff's reports, Defendant began criticizing Plaintiff's documentation work product on bases that had not been raised during her preceding two-and-a-half years of "excellent"-rated reviews.

114.    Program Director Christina Griffin — who had recently selected Plaintiff for additional leadership responsibilities — participated in the criticism of Plaintiff's work product.

115.    Plaintiff documented Defendant's differential treatment of her through text messages, calendar entries, and email correspondence.

**E.      Plaintiff's disability emerges and Defendant interferes with her FMLA leave (October–November 2024).**

116.    On October 11, 2024, Plaintiff was hospitalized for four days because of complications of her Stage 4 liver disease.

117.    Plaintiff provided same-day notice of her hospitalization to Defendant's leadership.

118.    On October 15, 2024, Plaintiff submitted physician-certified FMLA paperwork to Chief Human Resources Officer Sharon Northern.

119.    The FMLA paperwork approved continuous medical leave for one year, from October 11, 2024, through October 24, 2025.

120.    On October 15, 2024, Northern denied Plaintiff's FMLA request.

121.    Northern's denial cited a "thirty-day notice requirement."

122.    Plaintiff's leave was unforeseeable medical leave as contemplated by 29 C.F.R. § 825.303.

123.    No advance-notice requirement could lawfully be imposed on unforeseeable medical leave.

10

124.    On October 18, 2024 Plaintiff had surgery related to her liver disease.

125.    On October 28, 2024, while Plaintiff remained on medical leave, Plaintiff's Program Director reassigned Plaintiff's client caseload to other staff.

126.    The Program Director did not contact Plaintiff before reassigning her caseload.

127.    The Program Director instructed Plaintiff to return to work in person on October 28, 2024.

128.    On October 28, 2024, Plaintiff discovered that Defendant had restricted access to her work electronic accounts.

129.    No other employees on medical leave ever had their access to work electronic accounts restricted because it was assumed they would return to work at the end of their leave.

130.    Defendant restricted Plaintiff's access in anticipation of its planned termination of her employment.

131.    Plaintiff contacted Northern.

132.    Northern again stated that Plaintiff's "return-to-work date" was October 28, 2024.

133.    Northern denied Plaintiff's FMLA request a second time.

134.    Northern asserted Defendant needed "appropriate paperwork to support the extension."

135.    Defendant already had the physician-certified continuous-leave paperwork Plaintiff had submitted on October 15.

136.    Yet, after October 15, Northern emailed Plaintiff repeated requests for additional paperwork.

137.    Northern emailed Plaintiff that "FMLA paperwork must be turned in to them in 15 calendar days."

138.    Plaintiff had submitted physician-certified FMLA paperwork four days after her hospitalization.

139.    On November 12, 2024, Defendant approved Plaintiff's October 15 FMLA paperwork.

11

140. The November 12 approval was for the same paperwork Defendant had twice rejected.

141. The shortened deadlines and repeated requests for documentation Defendant already had were intended to create a pretext to deny Plaintiff leave or terminate her employment.

**F.    Plaintiff transitions to ADA leave (January–April 2025).**

142. On January 6, 2025, Plaintiff notified Northern that she was extending her leave on ADA grounds rather than FMLA.

143. Plaintiff's medical condition had not stabilized.

144. Plaintiff's continuous incapacity remained physician-certified.

145. Through January, February, March, April, and May 2025, Plaintiff submitted ADA documentation.

146. Plaintiff requested extensions consistent with HR's stated procedures.

147. Plaintiff complied with HR's stated notice requirements.

148. On at least one occasion in late March or early April 2025, Plaintiff was unable to respond to email within HR's 24-hour window because she was actively incapacitated by her liver condition.

149. HR did not discipline or terminate Plaintiff for the late-March through early-April email lapse.

150. On April 8, 2025, Plaintiff submitted updated ADA paperwork.

151. On April 9, 2025, Northern instructed Plaintiff to notify HR by May 5, 2025 of her status.

152. The shortened deadlines and repeated requests for documentation Defendant already had were intended to create a pretext to deny Plaintiff leave or terminate her employment.

SILENCE LAW GROUP

12

**G.      Plaintiff files a Charge with the EEOC (April 2025).**

153.    In April 2025, while still on medical leave and after months of differential treatment, Plaintiff filed a Charge of Discrimination with the EEOC.

154.    Plaintiff's April 2025 EEOC Charge alleged retaliation, discrimination, and harassment by Defendant.

155.    The filing of an EEOC Charge is protected activity under 42 U.S.C. § 12203(a).

**H.      Defendant terminates Plaintiff one month after she filed her EEOC Charge (May 5–15, 2025).**

156.    On May 5, 2025, in compliance with Northern's April 9 instruction, Plaintiff notified Northern that she was extending her ADA leave.

157.    On May 9, 2025, Northern requested updated ADA documentation.

158.    Plaintiff submitted the requested ADA documentation the same day Northern requested it.

159.    On May 11, 2025, Northern responded that she could not access the PDF Plaintiff had submitted.

160.    On May 12, 2025, Plaintiff re-submitted the ADA documentation by fax.

161.    On May 14, 2025, Plaintiff sent Northern a follow-up email.

162.    Northern did not respond to Plaintiff's May 14 follow-up email.

163.    At 6:22 a.m. on May 15, 2025, Northern emailed Plaintiff to demand that she submit the same ADA documentation by 5:00 p.m. that same day.

164.    Plaintiff had already submitted the ADA documentation Northern was demanding twice in the preceding six days.

165.    At 5:24 p.m. on May 15, 2025 — twenty-four minutes after Northern's same-day deadline expired — Defendant terminated Plaintiff.

166.    Defendant stated the reason for termination as "job abandonment."

167.    Plaintiff did not abandon her job.

168.    Defendant's own employee handbook defines job abandonment as a failure to report to work for three consecutive days without notifying a supervisor.

13

169.    Plaintiff had notified Defendant on May 5 that she was extending leave.

170.    Plaintiff had twice submitted the requested ADA documentation in the six days preceding her termination.

171.    Plaintiff had sent a follow-up email on May 14 confirming her status.

172.    Plaintiff was in active two-way communication with Northern in the very email thread Defendant later cited as the basis for her termination.

173.    Plaintiff first saw Northern's May 15 6:22 a.m. email after she had already been terminated.

174.    The shortened deadlines and repeated requests for documentation Defendant already had were intended to create a pretext to deny Plaintiff leave or terminate her employment.

### I.    The retaliatory pattern is continuous.

175.    Defendant's conduct toward Plaintiff is a continuous, escalating, and causally linked retaliatory pattern.

176.    The pattern began within weeks of Plaintiff's August 2024 protected reports.

177.    The pattern includes the September 2024 "gossip" and "insubordination" discipline, the unique rules imposed on Plaintiff, the vehicle location monitoring, and the manufactured criticism of work product.

178.    The pattern includes the October–December 2024 FMLA obstruction.

179.    The pattern includes the five-month obstruction of Plaintiff's continuing ADA leave from January 2025 through May 2025.

180.    The pattern ended only when Defendant terminated Plaintiff on May 15, 2025.

SILENCE LAW GROUP

SILENCE LAW GROUP

## VI.    CLAIMS FOR RELIEF

### COUNT ONE

**Disability Discrimination — Americans with Disabilities Act**

**42 U.S.C. § 12112(a)**

181.    Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

182.    Plaintiff is a "qualified individual with a disability" within the meaning of 42 U.S.C. §§ 12102 and 12111(8).

183.    Plaintiff's Stage 4 NASH liver disease substantially limits one or more major life activities and major bodily functions.

184.    Plaintiff could perform the essential functions of her position with the reasonable accommodation of authorized medical leave.

185.    Defendant knew of Plaintiff's disability no later than October 11, 2024.

186.    Defendant terminated Plaintiff's employment because of her disability.

187.    Defendant's termination of Plaintiff because of her disability violates 42 U.S.C. § 12112(a).

188.    Defendant's conduct was undertaken with malice or with reckless indifference to Plaintiff's federally protected rights.

189.    Defendant's malice or reckless indifference entitles Plaintiff to punitive damages under 42 U.S.C. § 1981a(b)(1).

### COUNT TWO

**Failure to Accommodate — Americans with Disabilities Act**

**42 U.S.C. § 12112(b)(5)(A)**

190.    Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

191.    Plaintiff requested reasonable accommodation in the form of medical leave.

15

SILENCE LAW GROUP

192. Plaintiff's October 15, 2024 submission of physician-certified FMLA paperwork was a request for reasonable accommodation.

193. Plaintiff's ADA leave requests in January, February, March, April, and May 2025 were requests for a reasonable accommodation.

194. Plaintiff's requested medical leave was a reasonable accommodation.

195. Plaintiff's requested medical leave would not have imposed an undue hardship on Defendant.

196. Defendant operates more than fifty sites in Arizona and routinely manages staff coverage during employee leave.

197. Defendant's reassignment of Plaintiff's caseload to other staff in October 2024 demonstrates that staff coverage during her leave was readily achievable.

198. Defendant failed to engage in the interactive process in good faith.

199. Defendant repeatedly demanded duplicate documentation.

200. Defendant imposed same-day deadlines on Plaintiff.

201. Defendant denied physician-certified leave on improper grounds.

202. Defendant terminated Plaintiff hours after a same-day deadline of its own creation.

203. Defendant's failure to provide reasonable accommodation violates 42 U.S.C. § 12112(b)(5)(A).

204. Defendant's failure to engage in good-faith interactive process violates 42 U.S.C. § 12112(b)(5)(A).

## COUNT THREE
### ADA Retaliation
### 42 U.S.C. § 12203(a)

205. Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

16

206. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation in the form of medical leave.

207. Plaintiff engaged in protected activity under the ADA by filing a Charge of Discrimination with the EEOC in April 2025.

208. Defendant terminated Plaintiff approximately one month after she filed her EEOC Charge.

209. Defendant terminated Plaintiff immediately following her continuing requests for accommodation.

210. The temporal proximity between Plaintiff's protected activity and her termination establishes a causal connection.

211. Defendant's pretextual "job abandonment" justification — directed at an employee in active two-way communication with HR who had submitted the requested documentation twice — further establishes a causal connection.

212. Defendant's termination of Plaintiff in retaliation for her protected activity violates 42 U.S.C. § 12203(a).

213. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights.

214. Defendant's malice or reckless indifference entitles Plaintiff to punitive damages under 42 U.S.C. § 1981a(b)(1).

## COUNT FOUR

### FMLA Interference

### 29 U.S.C. § 2615(a)(1)

215. Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

216. Plaintiff was an "eligible employee" under 29 U.S.C. § 2611(2) because she had been employed by Defendant for more than twelve months as of October 11, 2024.

SILENCE LAW GROUP

17

SILENCE LAW GROUP

217.    Plaintiff was an "eligible employee" under 29 U.S.C. § 2611(2) because she had worked the requisite number of hours.

218.    Plaintiff was an "eligible employee" under 29 U.S.C. § 2611(2) because she was employed at a worksite where Defendant employed fifty or more employees within seventy-five miles.

219.    Plaintiff was entitled to FMLA leave under 29 U.S.C. § 2612(a)(1)(D) because of her own serious health condition.

220.    Plaintiff provided Defendant with notice of her need for FMLA leave on October 11, 2024 — the same day she was hospitalized.

221.    Plaintiff submitted physician-certified FMLA paperwork on October 15, 2024.

222.    After submitting that paperwork, Defendant sent numerous additional emails requesting further or appropriate documentation.

223.    Defendant interfered with Plaintiff's exercise of FMLA rights by denying her physician-certified continuous-leave paperwork on October 15, 2024 on improper "thirty-day notice" grounds inapplicable to unforeseeable medical leave.

224.    Defendant interfered with Plaintiff's exercise of FMLA rights by denying her FMLA paperwork a second time on October 28, 2024 while Defendant already had the certifying paperwork.

225.    Defendant interfered with Plaintiff's exercise of FMLA rights by reassigning her caseload during protected leave.

226.    Defendant interfered with Plaintiff's exercise of FMLA rights by severing her access to work-related electronic accounts during protected leave in anticipation of its planned termination of Plaintiff's employment.

227.    Defendant interfered with Plaintiff's exercise of FMLA rights by demanding her premature return to work.

228.    Defendant's conduct violates 29 U.S.C. § 2615(a)(1).

18

SILENCE LAW GROUP

## COUNT FIVE

### FMLA Retaliation

### 29 U.S.C. § 2615(a)(2)

229.   Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

230.   Plaintiff engaged in protected activity by exercising her rights under the FMLA.

231.   Defendant terminated Plaintiff.

232.   Defendant's termination of Plaintiff was motivated, in whole or in part, by her exercise of FMLA rights.

233.   Defendant's termination of Plaintiff in retaliation for her exercise of FMLA rights violates 29 U.S.C. § 2615(a)(2).

234.   Defendant's conduct was not in good faith.

235.   Defendant's conduct was without reasonable grounds.

236.   Defendant's lack of good faith and lack of reasonable grounds entitle Plaintiff to liquidated damages equal to the amount of lost wages and benefits under 29 U.S.C. § 2617(a)(1)(A)(iii).

## COUNT SIX

### Whistleblower Retaliation — Arizona Employment Protection Act

### A.R.S. § 23-1501(A)(3)(c)(i) and (ii)

237.   Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

238.   In August 2024, Plaintiff refused to commit acts that would have violated A.R.S. §§ 36-2918, 36-2918.01, 13-2310, and 13-2311.

239.   Plaintiff refused to bill AHCCCS in the manner her Regional Executive Director directed.

240.   Plaintiff refused to instruct her subordinates to bill AHCCCS in the manner her Regional Executive Director directed.

19

241.    Plaintiff's refusal is protected activity under A.R.S. § 23-1501(A)(3)(c)(i).

242.    In August 2024, Plaintiff disclosed in a reasonable manner to the Arizona Office of Inspector General that she had information and a reasonable belief Defendant was violating Arizona statutes by submitting fraudulent claims to AHCCCS.

243.    Plaintiff's external disclosure is protected activity under A.R.S. § 23-1501(3)(c)(ii).

244.    Defendant terminated Plaintiff's employment in retaliation for her refusal to commit acts that would have violated Arizona statutes.

245.    Defendant terminated Plaintiff's employment in retaliation for her reports of suspected violations to her supervisors and state authorities.

246.    The retaliation began within weeks of Plaintiff's August 2024 protected activity.

247.    The September 2024 "gossip" and "insubordination" discipline, the unique rules imposed on Plaintiff, the vehicle location monitoring, and the manufactured criticism of work product are evidence of retaliatory motive.

248.    The retaliation intensified when Plaintiff sought medical leave, including through the October 2024 FMLA denials, the caseload reassignment, the severance from work electronic accounts, and the constant obstruction of Plaintiff's ADA leave requests.

249.    The retaliation ended only when Defendant terminated Plaintiff at 5:24 p.m. on May 15, 2025, twenty-four minutes after a same-day deadline manufactured at 6:22 a.m. that morning.

250.    Defendant's stated reason for the termination — "job abandonment" — is pretextual.

251.    Defendant's own handbook defines job abandonment as a failure to report to work for three consecutive days without notifying a supervisor.

252.    Plaintiff was in continuous, documented, two-way communication with Defendant's HR Officer for the eight months leading up to her termination.

253.    Plaintiff had submitted the requested ADA documentation twice in the six days preceding her termination.

20

SILENCE LAW GROUP

254. The pretext is itself evidence of retaliatory motive.

255. Defendant's conduct violates A.R.S. § 23-1501(A)(3)(c).

256. Defendant acted with an evil mind.

257. Defendant's evil mind entitles Plaintiff to punitive damages under Arizona law.

**COUNT SEVEN**

**Whistleblower Retaliation — Federal False Claims Act**

**31 U.S.C. § 3730(h)**

258. Plaintiff incorporates the foregoing paragraphs as though fully set forth here.

259. AHCCCS is Arizona's Medicaid program.

260. AHCCCS is funded in substantial part by the federal government through Title XIX of the Social Security Act.

261. Claims submitted to AHCCCS for payment necessarily seek payment of federal funds.

262. A false or fraudulent claim submitted to AHCCCS is a false or fraudulent claim within the meaning of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq.

263. The conduct Plaintiff observed and reported, if true, would violate 31 U.S.C. §§ 3729(a)(1)(A) as knowingly presenting, or causing to be presented, false or fraudulent claims for payment to AHCCCS.

264. The conduct Plaintiff observed and reported, if true, would violate 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims paid by AHCCCS.

265. Plaintiff held an objectively reasonable belief that Defendant was violating, was about to violate, or was causing others to violate the federal False Claims Act.

266. Plaintiff's August 2024 refusal to bill AHCCCS in the manner her Regional Executive Director directed was a lawful act in furtherance of efforts to stop one or more violations of the federal False Claims Act.

21

267.    Plaintiff's August 2024 refusal to instruct her subordinates to bill AHCCCS in the manner her Regional Executive Director directed was a lawful act in furtherance of efforts to stop one or more violations of the federal False Claims Act.

268.    Plaintiff's August 2024 reports to clinical supervisor Paula Garcia and clinical supervisor Amber Ness, in which Plaintiff stated that she would not bill in the manner directed and would not instruct her subordinates to do so, were lawful acts in furtherance of efforts to stop one or more violations of the federal False Claims Act.

269.    Plaintiff's August 2024 report of fraudulent AHCCCS billing to the Arizona Office of Inspector General was a lawful act in furtherance of efforts to stop one or more violations of the federal False Claims Act.

270.    Plaintiff engaged in protected activity within the meaning of 31 U.S.C. § 3730(h)(1).

271.    Defendant knew of Plaintiff's protected activity.

272.    Plaintiff communicated her refusal to bill and her refusal to direct subordinates to bill directly to Defendant's clinical supervisors Paula Garcia and Amber Ness in August 2024.

273.    After those reports, Plaintiff made her report to the Arizona Office of Inspector General.

274.    After Plaintiff's report to the Arizona Office of Inspector General, officials from the state came to inspect Defendant's records.

275.    A week after the inspection of records, Lenius told Plaintiff and the other employees under her that they would no longer be universally taking the patient assessments Lenius had previously promoted.

276.    The September 2024 disciplinary action by Regional Executive Director Lisa Lenius against Plaintiff for "gossip" and "insubordination" characterized Plaintiff's protected objections and refusal to perpetuate the fraudulent billing practices and protocols as misconduct, demonstrating Defendant's knowledge of Plaintiff's protected activity.

SILENCE LAW GROUP

22

277.    Defendant disciplined, harassed, and otherwise discriminated against Plaintiff in the terms and conditions of her employment because of her protected activity.

278.    Defendant discharged Plaintiff on May 15, 2025, because of her protected activity.

279.    The temporal proximity between Plaintiff's protected activity and Defendant's adverse actions, the continuous and escalating pattern of retaliation alleged above, and the pretextual nature of Defendant's stated reason for termination establish causation.

280.    Defendant's conduct violates 31 U.S.C. § 3730(h)(1).

281.    Under 31 U.S.C. § 3730(h)(2), Plaintiff is entitled to all relief necessary to make her whole, including reinstatement with the same seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant for:

A.    Lost back pay, in an amount to be proven at trial;

B.    Front pay, in an amount to be proven at trial;

C.    The value of lost employment benefits, in an amount to be proven at trial;

D.    Compensatory damages for emotional distress, mental anguish, humiliation, loss of enjoyment of life, and other consequential damages, in amounts to be proven at trial;

E.    Liquidated damages under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(iii);

F.    Punitive damages under 42 U.S.C. § 1981a;

G.    Punitive damages under Arizona law;

H.    Reinstatement with the same seniority status Plaintiff would have had but for the retaliation, under 31 U.S.C. § 3730(h)(2), or, alternatively, lost wages and front pay;

SILENCE LAW GROUP

SILENCE LAW GROUP

I.     Two times the amount of back pay, in an amount to be proven at trial, under 31 U.S.C. § 3730(h)(2);

J.     Compensation for special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees, under 31 U.S.C. § 3730(h);

K.     Pre-judgment and post-judgment interest at the maximum lawful rate;

L.     Reasonable attorneys' fees and costs under 42 U.S.C. § 12205;

M.     Reasonable attorneys' and expert witnesses' fees and costs under 29 U.S.C. § 2617(a)(3);

N.     Reasonable attorneys' fees and costs under 31 U.S.C. § 3730(d);

O.     Reasonable attorneys' fees and costs under any other applicable provision; and

P.     Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED this 11th day of May 2026.

**Silence Law Group, PLLC**
*/s/ Jeffrey Silence*
Jeffrey Silence

*Attorney for Plaintiff Marilyn Grosso*